**United States District Court**
For the Northern District of California

1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                        NORTHERN DISTRICT OF CALIFORNIA

7

8   LECG, LLC,                                    No. C-13-0639 EMC

9               Plaintiff,

10        v.                                       **ORDER GRANTING PLAINTIFF'S
                                                   MOTION FOR SUMMARY
11   SANJAY UNNI,                                  JUDGMENT; AND DENYING
                                                   DEFENDANT'S MOTION FOR
12               Defendant.                        SUMMARY JUDGMENT**
    _____/
13                                                 **(Docket Nos. 57, 59)**

14   AND RELATED COUNTERCLAIMS.
    _____/
15

16

17                          **I.    INTRODUCTION**

18        Pending before the Court are the motions for summary judgment filed by Plaintiff LECG,

19   LLC and its former employee and Director, Dr. Sanjay Unni.  When Dr. Unni was with LECG, he

20   executed a Director Agreement which provided for $500,000 in advance bonus payments.  The

21   agreement in question provided that Dr. Unni would repay the advances through offsets to his future

22   bonuses and that, if Dr Unni's employment terminated before the advances were completely repaid

23   through these offsets, he would repay the outstanding balance.  Dr. Unni eventually resigned from

24   LECG before the advances had been fully offset by annual bonuses.  He never repaid the

25   outstanding balance.  LECG filed the instant action alleging breach of contract and unjust

26   enrichment while Dr. Unni counterclaimed for breach of contract, breach of an oral agreement, and

27   constructive discharge.

28

United States District Court

For the Northern District of California

1    LECG has moved for summary judgment on its own claims as well as Dr. Unni's

2    counterclaims.  Dr. Unni has also moved for summary judgment on LECG's claim.  For the

3    following reasons, LECG's motion for summary judgment will be **GRANTED** in full and Dr.

4    Unni's motion **DENIED**.

5                          **II.    FACTUAL & PROCEDURAL BACKGROUND**

6    A.    Dr. Unni Joins LECG and Executes a Principal Agreement and Director Agreement

7           LECG was a global expert consulting firm that provided expert consulting services in

8    litigation.  Docket No. 4, at 6.  Prior to joining LECG, Defendant/Counterclaim Plaintiff Dr. Sanjay

9    Unni taught financial economics at the University of Strathclyde in Glasgow, Scotland.  Declaration

10   of Dr. Sanjay Unni ("Unni Decl.") ¶ 3 (Docket No. 57-5).  Dr. Unni joined LECG in May 2000

11   when he was recruited by Dr. Mukesh Bajaj to join LECG's Securities Practice Group ("SPG").

12   Declaration of Dr. Mukesh Bajaj ("Bajaj Decl.") at 2 (Docket No. 62); Deposition of Dr. Sanjay

13   Unni ("Unni Dep.") at 17:16-7 (Docket No. 57-3).  In December 2000, Dr. Unni was promoted to

14   Managing Economist and in January 2002 he was promoted to Senior Managing Economist – the

15   most senior position within the staff ranks.  *See* Unni Decl. ¶¶ 4, 5; Bajaj Decl. at 2.  Throughout his

16   career at LECG, Unni worked primarily with Dr. Bajaj, who led the SPG.  Bajaj Decl. at 2; Unni

17   Decl. ¶ 9.

18          Dr. Unni was promoted to the rank of "principal" in April 2006.  Unni Decl. ¶ 8.  Pursuant to

19   this promotion, Dr. Unni executed an agreement ("Principal Agreement").  The terms of this

20   agreement were proposed by Dr. Bajaj and was not a typical LECG agreement.  Bajaj Decl. at 3.

21   The Principal Agreement provided an "Exclusive Employment" provision which stated:

22                  As a Principal of LECG, you agree to perform and bill all of your
                    professional consulting activities exclusively through LECG.  In
23                  conjunction with LECG's Practice Development Group and your other
                    colleagues at LECG, we expect you to expand your and LECG's
24                  consulting practice.  Unless the relevant expertise is not available at
                    LECG, LECG's staff will assist you on your engagements.  To the
25                  extent expertise needed on your engagements is not found within
                    LECG, we will work with you to find the resources necessary to
26                  complete your assignments.

27   Principal Agreement, at 1 (Docket No. 61-1).  The agreement provided that Dr. Unni's

28   compensation would be composed of two parts: (1) a $275,000 "base salary" and (2) a bonus that

2

**United States District Court**
For the Northern District of California

1   would be paid according to the LECG Senior Staff Bonus Plan.  *Id.*  Senior staff was entitled to

2   bonuses based on hours worked over a certain threshold, provided the individual was employed by

3   LECG on both the first and last day of the performance period.  LECG Employee Handbook, at

4   LECG - 00002407-09 (Docket No 61-4).

5         Dr. Unni's employment under the Principal Agreement was "at will."  The agreement

6   expressly provided

7           Your employment with LECG is based upon our mutual consent and,
        accordingly, either you or LECG may terminate your employment and

8           this agreement at any time, with or without cause.  If you decide to
        terminate your employment with LECG, you agree that you will

9           provide LECG with thirty (30) days prior written notice addressed to
        the Chairman of LECG.

10

11   Principal Agreement, at 4.  Further, the agreement contained an integration clause stating that it

12   superseded "all previous and contemporaneous oral negotiations, writings and understandings

13   between the parties concerning the subject matter of this agreement, and this agreement constitutes

14   the entire agreement between us."  *Id.* at 5.  Unni executed this agreement on April 24, 2006.  *Id.*

15         A little over a year later, Dr. Unni was promoted to the rank of Director.  Bajaj Decl. at 3;

16   Unni Decl. ¶ 10.  Dr. Mukesh recommended Unni for the promotion, because he wanted to reward

17   Unni's hard work, viewed him as highly skilled, and did not want to have Dr. Unni leave LECG.

18   *See* Bajaj Decl. at 3; Deposition of Tina M. Bussone ("Bussone Dep.") at 46:23-47:4 (Docket No.

19   60-1).  On November 1, 2007, Unni executed a letter entitled "Amendment to Employment

20   Agreement – Promotion to Director" ("Director Agreement").  Director Agreement at 3 (Docket No.

21   61-2).  This letter stated it was an amendment to the April 20, 2006 agreement.  *Id.* at 1.

22         The Director Agreement increased Dr. Unni's base salary to $360,000 and provided for an

23   additional annual bonus.  *Id.*  The annual bonus was defined as follows:

24           Your annual bonus will be entirely performance based, as determined
        by LECG Management and your sector leader, Dr. Mukesh Bajaj.  It is

25           expected that the amount of your bonus will be based on achievement
        of performance goals established by Dr. Bajaj, with criteria including

26           quality of work, amount of leverage, mentoring of staff, recruiting and
        business development.  This annual performance bonus is not

27           guaranteed.  However, if awarded, it will be in an aggregate amount
        that is at least equal to the two semi-annual bonuses that would have

28

3

**United States District Court**

For the Northern District of California

1  |  been paid to you under the LECG Senior Staff Bonus plan for the
2  |  same period.

3  *Id.* Accordingly, the terms of the Director Agreement expressly provided that annual bonuses were

4  not guaranteed. Dr. Bajaj has stated in his declaration that under this agreement, Unni could earn

5  bonuses in two ways:

6  |  First, the "Senior Staff Bonus" (or "effort bonus") was formulaically
   |  determined based on his billable hours as per LECG's normal policy
7  |  for salaried senior staff. . . . [T]his bonus was not guaranteed. . . . The
   |  second component of Unni's bonus, if any was awarded, was to be
8  |  funded by certain portion of finder fees on cases in which he worked. .
   |  . . This bonus was paid at my discretion. For the years 2007 - 2009,
9  |  majority [sic] of Unni's bonus came from this second component, of
   |  which my finder fees funded over 90%.

10

11  Bajaj Decl. at 3-4.[1] In other words, if a performance bonus was awarded, it would "not be less than

12  the effort bonus Dr. Unni would have earned as a senior staff member before his promotion." *Id.* at

13  4. The bonus was structured in this way so that he "would not be worse off than he would have been

14  under his prior employment agreement with LECG. At the same time, it gave him the possibility to

15  earn more." *Id.*

16  In addition, the Director Agreement provided for two advance payments on future annual

17  bonuses. Specifically, it stated:

18  |  In recognition of your future potential, LECG is prepared to make two
   |  advance payments toward this annual bonus as follows:
19
20  |  1) $250,000 payable on November 1, 2007; and

   |  2) $250,000 payable on April 1, 2008
21

22  Director Agreement at 2. The agreement than stated that "[n]either of these advance bonus

23  payments will be fully earned when paid. Rather, each $250,000 advance bonus payment will be

24  offset against future annual performance bonus determined to be due to you." *Id.* The agreement

25

---

26  [1] The "second component" of this bonus came from a bonus pool that was funded from
27  "finder's fees" arising out of matters originated by Dr. Bajaj either solely or with another LECG
   expert. Docket No. 65-4. Distribution of this bonus pool by Dr. Bajaj to Unni was at Dr. Bajaj's
   discretion subject to "any reasonable criteria he chooses" so long as "he is not discriminatory in his
28  application of such criteria." *Id.*

4

**United States District Court**

For the Northern District of California

1    then provides for the rate of offset.  For example, in the first year after an advance payment,

2    $16,666.67 would be deducted from that year's annual bonus amount.  *Id.*  Critical to the instant

3    dispute, the agreement then provided that "in the event [Dr. Unni's] employment with LECG

4    terminates, you will owe the entire amount of the balance for each advance that has not been fully

5    offset against actual bonuses."  *Id.*

6          Finally, the Director Agreement contains an integration clause that states the "Amendment

7    supersedes all previous and contemporaneous oral negotiations, writings and understandings

8    between the parties concerning the subject matter of this Amendment to the Principal Agreement."

9    *Id.*  It provided that the Principal Agreement remained in "full force and effect" and "constitutes

10   [Unni's] entire agreement with LECG."  *Id.*  Finally, the integration clause provided that the

11   Amendment "does not change [Dr. Unni's] status as an at-will employee" and that any changes to

12   the agreement would need to be made in a writing signed by all the parties.  *Id.*

13         Dr. Unni was employed at LECG on the requisite dates under the Director Agreement and

14   received both $250,000 advances, less withheld taxes.  Docket No. 61-3.  Dr. Unni asserts that the

15   advance bonus payments under the Director Agreement were offered with the "understanding that,

16   in exchange for providing the payment, LECG would provide [him] with a platform to build and

17   grow [his] existing practice."  Unni Decl. ¶ 12.  He further states that he "understood that LECG

18   would continue to operate through the entire amortization period."  *Id.*  In his deposition, Unni

19   conceded that nobody expressly promised that LECG would remain in business so that Unni could

20   earn the bonuses asserted in the amortization schedule.  Unni Dep. at 175:1-7.  Rather, he asserts

21   that discussions with Dr. Bajaj stated that the "agreement made sense contingent on our being able

22   to sustain" growth.  *Id.* at 175:20-21.

23   B.    Developments in LECG's Business

24         Beginning in 2010, LECG began to experience a number of departures of staff members and

25   office closing.[2]  For example, according to LECG's SEC filings, on September 30, 2009, LECG's

26   "billable headcount" in the "Litigation, Forensics and Finance" group was 447.  By December 31, of

27

28         [2] Unni asserts this development was caused by an ill-advised merger.

5

1    that year, it had been reduced to 415.  By September 30, 2010, it was down to 310, for an overall

2    31% decrease for 2010.  Docket No. 57-11, at 32.

3    C.      Dr. Unni's Resignation from LECG

4            Dr. Unni asserts that during the spring and summer of 2010, he became aware that Dr. Bajaj

5    – along with other key experts with whom Dr. Bajaj worked – were negotiating the terms of their

6    departures from LECG.  Unni Decl. ¶ 16.  During this time frame, Unni had discussions with Dr.

7    Bajaj about the possibility of Dr. Unni leaving LECG.  Unni Dep. at 39:4-6 (Docket No. 60-2).  Dr.

8    Bajaj attempted to induce Dr. Unni to remain at LECG by speaking to him about "the continued

9    plans for growth that [Dr. Bajaj] had for his practice.  And his belief that [Unni] could reward

10   [himself] financially by participating in the growth of his practice."  *Id.* at 39:12-15.

11           Nonetheless, Dr. Unni asserts that the departures of individuals from the securities practice

12   group  made it "impossible for [him] to perform [his] work and earn the bonuses that would enable

13   [him] to cover the amortization amounts."  *Id.*  Thus, he states that he knew he "needed to make

14   plans to find another job because there was no viable future with LECG."  *Id.* ¶ 17.  During his

15   deposition, Dr. Unni stated that he felt that leaving LECG would provide him better alternatives to

16   build an independent practice because given Dr. Bajaj's "eminence in the field," it would be difficult

17   for Unni to develop an independent practice as long as he continued to work on Dr. Bajaj's cases

18   and in his practice.  Unni Dep. at 206:11-22 (Docket No. 60-2).  Dr. Bajaj  asserts that Dr. Unni told

19   him he was leaving LECG because (1) he believed he could "accelerate development of his own

20   practice as a testifying expert" by joining Berkeley Research Group ("BRG"), and (2) that he had

21   been working very hard and his "wife had threatened to divorce him if he did not leave his position"

22   with LECG.  Bajaj Decl. at 7.

23           On September 3, 2010, Dr. Unni sent an email to Ms. Bussone providing notice of his

24   resignation, effective October 3, 2010.  Docket No. 61-9.  One day after his resignation from LECG,

25   Unni became a director with BRG.  Docket No. 61-10.

26   D.      LECG After Unni's Departure

27           Following Unni's departure, Dr. Bajaj sent an email on October 3, 2010 to Tina Bussone (the

28   head of human resources and operations), expressing displeasure with the state of the SPG:

United States District Court

For the Northern District of California

6

United States District Court

For the Northern District of California

1
2
3
4
5

> In any case, I am seeing the poison spread very rapidly.  At this rate I do not know if I will have a practice left soon unless I am in a more stable environment.  I am letting you know that you do not have the luxury of time here.  If I wait for you, I will lose everything I have worked for in the last fifteen years.  In my opinion, what is happening may already have constituted occurrence of one of more of [sic] involuntary termination events per my contract and I need to know if you are ready and able to move very quickly to allow me to try to hold things together.

6   Docket No. 57-15.  According to Dr. Unni, by February 2011, LECG's entire securities practice had

7   departed.  Unni Decl. ¶ 16.

8      On March 17, 2011, LECG stated in an SEC filing that it had "previously announced the sale

9   of several of its practice groups and, with the advice of its restructuring advisors, is currently

10  continuing to negotiate the divestiture or other transition of most of its remaining practice groups."

11  Docket No. 57-10.  By April 1, 2011, LECG's public filings revealed that the "firm has fewer than

12  70 employees, the majority of whom management expects to leave within the next 30 days."  Docket

13  No. 57-12, at 5.  LECG ceased to provide expert consulting services in or around June 2011.

14  Declaration of Jan Call ("Call Decl.") ¶ 32 (Docket No. 61).

15  E.      Unni's Unearned Bonus

16      In 2008 and 2009, Dr. Unni received performance bonuses and, pursuant to the offset

17  schedule in the Director Agreement, these two bonuses were reduced by \$16,666.67 and

18  \$33,333.333, respectively.  Call Decl. ¶ 22.  Accordingly, beginning in 2010, a combined \$400,000

19  in advanced bonus payments remained.  Dr. Unni received a \$33,210 bonus for 2010.  *Id.* ¶ 23.

20  Pursuant to the offset schedule, the entire \$33,210 bonus was credited towards the outstanding

21  balance.  Thus, at the time of Unni's resignation, \$366,790 in advanced bonus payments

22  remained"unreduced."  *Id.* ¶ 30.  Jan Call sent Dr. Unni letters on November 23, 2010 and January

23  4, 2011 demanding that Dr. Unni reimburse LECG the \$366,790 amount.  Docket No. 61-13.

24  F.      This Lawsuit

25      When Unni failed to pay, LECG filed the instant action in California superior court on

26  December 15, 2012 – almost two years after the last attempt to collect the amount. Complaint

27  (Docket No. 1, at 6).  LECG asserts two causes of action – breach of contract and unjust enrichment.

28

7

United States District Court

For the Northern District of California

1    Following removal to this Court, Dr. Unni filed an answer and counterclaim.  Dr. Unni's

2  counterclaim asserts 5 causes of action.  First, Dr. Unni asserts a cause of action for breach of

3  contract, arguing that implicit in the Director Agreement was the "promise by LECG that it would

4  remain viable as an ongoing business and provide Dr. Unni with an opportunity to earn future

5  bonuses as set forth in the amortization schedule."  Counterclaim ¶ 87 (Docket No. 4).  Second, Dr.

6  Unni asserts a claim for breach of an oral agreement on the basis of an alleged oral agreement to pay

7  him a bonus for working 10 of the 12 months in 2010.  *Id.* ¶ 93.  Third, Dr. Unni seeks an equitable

8  accounting to determine the bonus amount to which he is allegedly entitled.  *Id.* ¶¶ 95-100.  Fourth,

9  Dr. Unni asserts a claim for constructive discharge, alleging that LECG made his performance

10  impossible "due to the chaos and turmoil occurring at LECG that ultimately resulted in its

11  insolvency."  *Id.* ¶ 103.

## III.    JURISDICTION

13    Original jurisdiction exists over this action under 28 U.S.C. § 1332.  However, this action

14  was removed from California superior court.  According to the notice of removal, Dr. Unni is a

15  citizen of California.  *See* Docket No. 1, at 3 ("Defendant Sanjay Unni is a citizen of the State of

16  California, residing in Lafayette, California.").  Because of this, *Dr. Unni was not permitted to*

17  *remove this action*.  Under 28 U.S.C. § 1441(b)(2), a "civil action otherwise removable solely on the

18  basis of the jurisdiction under section 1332(a) . . . may not be removed if any of the parties in

19  interest properly joined and served as defendants is a citizen of the State in which such action is

20  brought."  This limitation on removal is referred to as the "forum defendant rule."  Had LECG filed

21  a timely motion to remand, this action would have been remanded for lack of removal jurisdiction.

22    However, LECG did not file a motion to remand.  In *Lively v. Wild Oats Markets, Inc.*, 456

23  F.3d 933 (9th Cir. 2006), the Ninth Circuit concluded that the forum defendant rule is not a

24  jurisdictional rule.  Specifically, it held that the "forum defendant rule embodied in § 1441(b) is a

25  procedural requirement, and thus a violation of this rule constitutes a waivable non-jurisdictional

26  defect subject to the 30-day time limit imposed by § 1447(c)."  *Id.* at 942.  Accordingly, the court

27  found that the "district court exceeded its § 1447(c) authority in ordering a remand" where the

28  plaintiff had failed to object to the removal by a forum defendant within 30 days.  *See id.*; *see also*

1   *Galvan v Nationstar Mortgage*, No. 3:13-cv-00234-MMD-WGC, 2014 WL 644320 (D. Nev. Feb.

2   18, 2014) ("The Court notes that had Plaintiff removed the case properly as a separate action, the

3   removal would have violated 28 U.S.C. § 1441(b)(2) although the violation would have been

4   procedural and subject to waiver."); *Hamilton v. Silven, Schmeits & Vaughn, PC*, — F. Supp. 2d — ,

5   2013 WL 5723123, at *1 n.1 (D. Or. Oct. 21, 2013) ("Defendants' removal was improper under the

6   forum defendant rule, but Plaintiffs failed to move for remand within 30 days, thereby waiving that

7   objection." (citation omitted)).

8                                  **IV.    DISCUSSION**

9          Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

10   the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

11   affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

12   party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine

13   only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See*

14   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

15   "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on

16   which the jury could reasonably find for the [nonmoving party]." *Id.* at 252, 106 S.Ct. 2505. At the

17   summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving

18   party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255, 106

19   S.Ct. 2505.

20   A.    <u>LECG Is Entitled to Its Breach of Contract Claim and Dr. Unni's First Counterclaim Because</u>

21         <u>There Is No Genuine Dispute of Material Fact as to Whether Dr. Unni Breached the Director</u>

22         <u>Agreement</u>

23          To prevail on its breach of contract claim, LECG must prove (1) the existence of a contract,

24   (2) its performance or excuse for non-performance, (3) Unni's breach of the contract, and (4)

25   damage to LECG resulting from the breach. *Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d

26   887, 913 (1971). "California recognizes the objective theory of contracts, under which it is the

27   objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of

28   the parties, that controls interpretation . . . [t]he parties' undisclosed intent or understanding is

**United States District Court**
For the Northern District of California

**United States District Court**

For the Northern District of California

1  irrelevant to contract interpretation." *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014 WL

2  988992, at *7 (N.D. Cal. Mar. 10, 2014) (quoting *Founding Members of the Newport Beach Country*

3  *Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003)).

4  The terms of a "final, integrated contract 'may not be contradicted by evidence of any prior

5  agreement or of a contemporaneous oral agreement.'" *Grey v. Am. Mgmt. Servs.*, 204 Cal. App. 4th

6  803, 807 (2012) (quoting Cal. Code Civ. Proc. § 1856(a)).  An integration clause is a "key factor" in

7  diving that intent and has "'been held conclusive on the issue of integration, so that parol evidence

8  to show that the parties did not intend the writing to constitute the sole agreement will be

9  excluded.'" *Grey*, 204 Cal. App. 4th at 807 (quoting 2 Witkin, Cal. Evid., Doc. Evid. § 70 (4th ed.

10  2000)).

11  LECG's breach of contract claim and Dr. Unni's breach of contract counterclaim (Count 1)

12  raise essentially identical issues as they are two sides of the same coin.  The parties do not dispute

13  the existence of a contract – both parties appear to agree that the Principal Agreement and Director

14  Agreement are enforceable contracts.  Further, it is undisputed that LECG paid Dr. Unni two,

15  $250,000 advance bonus payments and that $366,790 remained "unreduced" at the time Dr. Unni

16  resigned form LECG.

17  Instead, the central dispute raised by Dr. Unni's defense (and his breach of contract

18  counterclaim) is whether LECG rendered his performance "impracticable" or "frustrated the

19  purpose" of the two agreements.  The defense of impossibility (or impracticability) generally

20  provides:

21  "Where, after a contract is made, a party's performance is made
    impracticable without his fault by the occurrence of an event the non-
22  occurrence of which was a basic assumption on which the contract
    was made, his duty to render that performance is discharged, unless
23  the language or the circumstances indicate to the contrary."

24  *Cazares v. Saenz*, 209 Cal. App. 3d 279, 285 n.7 (1989) (quoting Restatement of Contracts (Second)

25  § 261).  Significantly, the comment to the section 261 of the Restatement (Second) of Contracts,

26  discussing the concept of a "basic assumption" provides:

27  Its application is also simple enough in the cases of market shifts or
    the financial inability of one of the parties.  The continuation of
28  existing market conditions and of the financial situation of the parties

**United States District Court**
For the Northern District of California

1
2
> are ordinarily not such assumptions, so that mere market shifts or
> financial inability do not usually effect discharge under the rule stated
> in this Section.

3  Restatement (Second) of Contracts § 261 cmt.

4      Similarly, the defense of frustration of purpose "'arises when a change in circumstances

5  makes one party's performance virtually worthless to the other, frustrating his purpose in making the

6  contract.'" *Century Sur. Co. v. 350 W.A., LLC*, No. 05-CV-1538-L(LSP), 2007 WL 2688488, at *4

7  (S.D. Cal. Sept. 7, 2007) (quoting Restatement (Second) of Contracts § 265).  The Restatement

8  explains that in order for a party's performance to be discharged by supervening frustration, the

9  frustrated purpose

10
11
12
> must have been a principal purpose of that party in making the
> contract.  It is not enough that he had in mind some specific object
> without which he would not have made the contract.  The object must
> be so completely the basis of the contract that, as both parties
> understand, without it the transaction would make little sense.

13  Restatement (Second) of Contracts § 265 cmt.; *see also Dorn v. Goetz*, 85 Cal. App. 2d 407, 411

14  (1948) (doctrine of frustration of purpose does not apply simply because "purpose or 'desired

15  object' of one of the parties to the contract has been frustrated")  Further, like with the defense of

16  impracticability discussed above, the "non-occurrence of the frustrating event must have been a

17  basic assumption on which the contract was made.  This involves essentially the same sorts of

18  determinations that are involved under the general rule on impracticability." *Id.*

19      Dr. Unni essentially argues that a "basic assumption" of the Principal Agreement and

20  Director Agreement was that Dr. Unni would be able to work at LECG for five years, earn bonuses,

21  and thus offset the amount of the advance payments.  For instance, in his motion for summary

22  judgment, Dr. Unni describes the breach of contract dispute as follows:

23
24
25
26
> According to LECG, to satisfy his obligations to LECG, Dr. Unni was
> required to work at LECG through Year 5 (2012) and his failure to do
> so requires him to repay the bonus LECG gave him in recognition of
> his future potential with LECG.  A basic assumption upon which this
> Agreement rested is that Dr. Unni *could* satisfy his obligations under
> the Agreement and work through the close of Year 5.

27  Unni Mot. for Summary Judgment ("Unni Mot.") at 7 (Docket No. 57).  Similarly, in his opposition

28  to LECG's motion for summary judgment, he argued that in signing the Principal Agreement and

1   Director Agreement,  "LECG agreed that unless Dr. Unni stayed with LECG through 2012, he

2   would have to re-pay the advances.  LECG went out of business before Dr. Unni could fulfill his

3   part of the bargain." Unni Opp. to LECG's Mot. for Summary Judgment ("Unni Opp.") at 7 (Docket

4   No. 71).  According to Dr. Unni, therefore, the fact that LECG went out of business before he could

5   work at LECG for five years excuses his obligation to repay the un-repaid advances.

6           Dr. Unni's argument is without merit because his purported "basic assumption" is flatly

7   contradicted by three express provisions of the Principal and Director Agreements.  First, both

8   agreements expressly provide that Dr. Unni was an at-will employee.  *See* Principal Agreement at 4

9   ("[E]ither you or LECG may terminate your employment and this agreement at any time, with or

10  without cause."); Director Agreement at 3 ("This Director Agreement does not change your status as

11  an at-will employee.").  Accordingly, Dr. Unni could have been terminated for any reason, with or

12  without cause, at any point after execution of either Agreement.  *See Comeaux v. Brown &*

13  *Williamson Tobacco Co.*, 915 F.2d 1264, 1271 (9th Cir. 1990) ("In California, employment is

14  presumed to be 'at will,' and an employee can be fired without good cause, unless there exists an

15  express or implied contract that restricts the employer's right to terminate the employee.").  As the

16  California Supreme Court has noted, "because employment at will *allows* the employer freedom to

17  terminate the relationship as it chooses, the employer does not frustrate the employee's contractual

18  rights merely by doing so." *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1110 (Cal. 2000).  Far from

19  assuming (or having as a "basic assumption") that Dr. Unni would be allowed to work at LECG for

20  five years, both Agreements expressly noted that Dr. Unni could be terminated at any time, for any

21  lawful reason.  This would have included being laid off because of the poor financial condition of

22  LECG.

23          Second, the Director's Agreement provides that "in the event [Dr. Unni's] employment with

24  LECG terminates, you will owe the entire amount of the balance for each advance that has not been

25  fully offset against actual bonuses."  Director Agreement at 2.  Similarly, the Agreement expressly

26  stated that the advance bonuses were not earned at the time of the advances.  *See id.* ("Neither of

27  these advance bonus payments will be fully earned when paid.").  Accordingly, the Agreement

28  contemplates that as an at-will employee, Dr. Unni would have been terminated at any time, thus

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   preventing him from earning bonuses.  The Director Agreement expressly provides that were that to

2   happen, Dr. Unni would be required to repay the unearned portion of advance bonuses.  *See, e.g.*,

3   *Northern Indiana Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir. 1986)

4   ("Since impossibility and related doctrines are devices for shifting risk in accordance with the

5   parties' presumed intentions . . . they have no place when the contract explicitly assigns a particular

6   risk to one party or the other."); *see also Imprimis Intern., Inc. v. Fraidenburgh*, No. CIV. S-04-

7   1297 FCD DAD, 2007 WL 1576356 (E.D. Cal. May 31, 2007) ("Because defendant's asserted

8   'supervening occurrence' was contemplated in the contract, the purpose of the contract was not

9   frustrated by an event, 'the non-occurrence of which was a basic assumption on which the contract

10  was made.'").

11          Further, even if it is assumed, for the sake of argument, that it was a basic assumption that

12  Dr. Unni would be employed by LECG for five years and that LECG's subsequent closure

13  "frustrated" that assumption or made that impossible, the defenses would still be inapplicable.  As

14  discussed above, the defenses apply "unless the language or the circumstances indicate the

15  contrary."  The language of the Director Agreement did provide "to the contrary."  *See Harford*

16  *Donuts, Inc. v. Dunkin' Donuts Inc.*, No. CIV. L-98-3668, 2001 WL 403473 (D. Md. Apr. 10, 2001)

17  ("Plaintiffs may not argue frustration of purpose because the establishment of additional franchises

18  was explicitly contemplated in the franchise agreements.")  By stating that Dr. Unni was required to

19  pay back the outstanding balance if his employment terminated (without qualifying "termination" in

20  any way since he was an "at-will" employee), the Director Agreement places the risk of Dr. Unni

21  being unable to work at LECG for a sufficient time to offset the advances squarely on Dr. Unni's

22  shoulders; it did not provide the guarantee he now seeks.

23          Finally, the Director Agreement provide that Dr. Unni was not guaranteed an award of

24  annual bonuses.  *See* Director Agreement at 1 ("Your annual bonus will be entirely performance

25  based . . . .  This annual performance bonus is not guaranteed.").  The bonus was part of Dr. Bajaj's

26  discretion.  Bajaj Decl. at 3-4.  This undermines any contention by Dr. Unni that the parties assumed

27  he was entitled to earn annual bonuses.

28

1   "There is no impossibility of performance when one party has performed as agreed and all

2   that remains for the other party to do is pay the agreed compensation." *See Peoplesoft USA, Inc. v.*

3   *Softeck, Inc.*, 227 F. Supp. 2d 1116, 1119 (N.D. Cal. 2002). Here, LECG performed under the

4   Director Agreement with regards to the advance bonus payments – it paid Dr. Unni $500,000 in

5   advance bonus payments. As noted above, LECG was not obligated to retain Dr. Unni for five

6   years; LECG thus "performed as agreed." In contrast, Dr. Unni has had the use and enjoyment of

7   this half a million dollars for six years. Effective on the date of his resignation, Dr. Unni's

8   obligation under the Director Agreement was clear: repay the amount of the advance bonus

9   payments that had not been offset by the annual bonuses he had received. This performance has not

10  been rendered impracticable, impossible, or worthless by LECG's closing. Simply stated, the

11  Principal and Director Agreement gave Dr. Unni no right or expectation in either continued

12  employment at LECG or the award of annual bonuses.

13      Accordingly, LECG's closure did not render Dr. Unni's performance (repaying the advance

14  bonuses) impracticable and did not frustrate the purpose of the Director Agreement. Dr. Unni is not

15  entitled to retain the benefits of the advance bonus payments. Thus, the Court **GRANTS** LECG's

16  motion for summary judgment on its breach of contract claim and **DENIES** Dr. Unni's motion for

17  summary judgment on Count 1 of his counterclaim.

18  B.      LECG Is Entitled to Summary Judgment on Dr. Unni's Remaining Counterclaims

19      Dr. Unni's first counterclaim is for breach of contract. As discussed above, this counterclaim

20  is essentially identical to Dr. Unni's defense to LECG's breach of contract claim. For the same

21  reasons the Court has granted LECG's motion for summary judgment on its breach of contract

22  claim, it has also denied Dr. Unni's breach of contract counterclaim. Dr. Unni, however, asserts two

23  additional independent counterclaims.

24      1.      LECG Is Entitled to Summary Judgment on Dr. Unni's Breach of  Oral Contract

25              Counterclaim (Count II)

26      Dr. Unni's second counterclaim asserts that LECG breached an oral agreement by failing to

27  pay him a bonus due and owing to him in 2010. Counterclaim ¶¶ 92-94. Dr. Unni's Counterclaim,

28  however, contains absolutely no factual allegations supporting the existence of the oral agreement.

United States District Court
For the Northern District of California

14

**United States District Court**
For the Northern District of California

1   It does not allege, for example, with whom he spoke regarding the terms, what the terms of the oral

2   agreement are, when the oral agreement was entered into, etc.

3          Dr. Unni's opposition to LECG's motion for summary judgment on this claim likewise fails

4   to provide any insight into the contours of this alleged oral agreement.  Rather, he asserts:

5                  However, in its answer to Dr. Unni's counterclaims, LECG admits
                   that, in addition to the amounts set forth in the Principal Agreement
6                  and Director Agreement, Dr. Unni was paid additional bonus amounts
                   based on his performance in 2007, 2008 and 2009.  (Dckt. No. 15, p.
7                  92.)  Dr. Unni has asserted that a contract existed regarding additional
                   performance-based bonuses, that LECG failed to pay this additional
8                  performance-based bonus in 2010 despite Dr. Unni successfully
                   performing for 10 of the 12 months of 2010, and that he was damaged
9                  by LECG's failure to pay this bonus by not receiving the promised
                   monies.
10

11  Unni Opp. at 10.  Besides the citation to LECG's answer, Dr. Unni has failed to cite to any

12  deposition transcript, document, or declaration that supports the existence or terms of the alleged

13  oral agreement.  Further, the fact section of Dr. Unni's motion for summary judgment and

14  opposition to LECG's motion for summary judgment do not reference any oral agreement, let alone

15  discuss its terms.  Dr. Unni's declaration is similarly silent.

16         It is not the obligation of the Court to scour through the record to determine if there is a

17  genuine dispute of material fact in support of his counterclaims.  *See Fowler v. Cal. Highway Patrol*,

18  No. 13-cv-01026-THE, 2014 WL 1665046, at *5 (N.D. Cal. Apr. 25, 2014) ("A district court has no

19  independent duty 'to scour the record in search of a genuine issue of triable fact' and may 'rely on

20  the nonmoving party to identify with reasonable particularity the evidence that precludes summary

21  judgment.'" (citation omitted)).  Dr. Unni's counsel's failure to provide even perfunctory factual

22  support or citations to the record in support of this counterclaim is baffling.  Absent any contrary

23  evidence from Dr. Unni, the undisputed evidence (as discussed above) establishes that Dr. Unni's

24  bonus was discretionary and not guaranteed.  Because Dr. Unni has failed to demonstrate that there

25  is a genuine dispute of material fact as to the existence of an oral agreement, its terms, or how LECG

26  breached such an agreement, LECG's motion for summary judgment as to Count II of Dr. Unni's

27  counterclaims is **GRANTED**.

28

**United States District Court**
For the Northern District of California

1    2.    <u>LECG Is Entitled to Summary Judgment on Dr. Unni's Constructive Discharge</u>

2          <u>Counterclaim (Count IV)</u>

3          To prevail on his counterclaim for constructive discharge, Dr. Unni must establish that

4    LECG "either intentionally created or knowingly permitted working conditions that were so

5    intolerable or aggravated at the time of" Dr. Unni's resignation that a "reasonable employer would

6    realize that a reasonable person in the employee's position would be compelled to resign." *Cloud v.*

7    *Casey*, 76 Cal. App. 4th 895, 902 (1999) (quoting *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238,

8    1246 (1994)).  Under California law, "an at-will employee has no contractual claim for wrongful

9    discharge based on constructive discharge on account of intolerable working conditions." *Starzynski*

10   *v. Capital Public Radio, Inc.*, 88 Cal. App. 4th 33, 41 (2001).  To state a *tort* claim for wrongful

11   discharge, Dr. Unni must establish that he was terminated for a reason that "contravenes

12   fundamental public policy as expressed in a constitutional or statutory provision." *Id.*

13         Dr. Unni cannot meet either standard.  First, Dr. Unni has not asserted a tort claim for

14   constructive discharge – he does not argue that he was terminated for a reason that contravenes

15   fundamental cognizable public policy, and he cites no statute or constitutional provision that LECG

16   allegedly violated.  Nor does he cite any case that holds a layoff (actual or constructive) due to a

17   financial downturn violates fundamental public policy.

18         Second, he argues that whether conditions were so "aggravated" or "intolerable" is

19   traditionally a question of fact.  Unni Opp. at 11.  Dr. Unni's claim still fails as a matter of law.  He

20   concedes he was an at-will employee.  *Id.* at 12.  Regardless of how "intolerable" or "aggravated"

21   working conditions at LECG may have been, he simply cannot state a claim for constructive

22   discharge as an at will employee.  Moreover, the "intolerable" condition here is not some deliberate

23   pattern of mistreatment but a downturn in business opportunities and conditions.  Accordingly,

24   LECG's motion for summary judgment as to Dr. Unni's constructive discharge counterclaim is

25   **GRANTED**.[3]

26

27         [3] Because the Court has granted LECG's motion for summary judgment as to Dr. Unni's substantive counterclaims, it also **GRANTS** summary judgment to LECG on Dr. Unni's remaining
28   counterclaims seeking declaratory relief and equitable counting.

United States District Court

For the Northern District of California

1

## V.   CONCLUSION

2      For the foregoing reasons, the Court **GRANTS** LECG's motion for summary judgment in

3   full.  Accordingly, the Court will enter judgment in favor of LECG in the amount of $366,790.  The

4   Clerk is instructed to close the file.

5      This order disposes of Docket Nos. 57 and 59.

6

7      IT IS SO ORDERED.

8

9   Dated:  May 23, 2014

10

    _____

11  EDWARD M. CHEN
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28